UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CITY OF YREKA, CITY COUNCIL OF
THE CITY OF YREKA,

        Plaintiffs,

   v.

KEN SALAZAR in his official
capacity as Secretary of the
Interior; LARRY ECHOHAWK in
his official capacity as
Assistant Secretary for Indian
Affairs of the United States
Department of Interior and
BUREAU OF INDIAN AFFAIRS; DALE
MORRIS in his official
capacity as Pacific Regional
Director, Bureau of Indian
Affairs; MICHAEL MALLORY in
his official capacity as
Siskiyou County Assessor-
Recorder; Does 1 through 100,

        Defendants.
_____/

NO. CIV. 2:10-1734 WBS EFB

<u>MEMORANDUM AND ORDER RE:
MOTIONS FOR SUMMARY JUDGMENT
OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION</u>

----oo0oo----

      Plaintiffs City of Yreka ("City") and City Council of

the City of Yreka ("City Council") brought this action pursuant

1

1  to the Administrative Procedures Act ("APA"), 5 U.S.C. §§

2  701-706, against defendants Ken Salazar, in his official capacity

3  as Secretary of the United States Department of the Interior

4  ("Secretary"); Larry Echohawk, in his official capacity as

5  Assistant Secretary for Indian Affairs of the Department of the

6  Interior; the Bureau of Indian Affairs ("BIA"); Dale Morris, in

7  his official capacity as the Pacific Regional Director ("regional

8  director") of the BIA; and Michael Mallory, in his official

9  capacity as Siskiyou County Assessor-Recorder, arising from the

10 Secretary's decision to acquire approximately 0.90 acres of land

11 to be held in trust by the United States for the Karuk Tribe of

12 California ("Karuk," "tribe," or "KTOC").  The Secretary decided

13 to acquire the land pursuant to the Indian Reorganization Act

14 ("IRA"), 25 U.S.C. §§ 461-79, and its implementing regulations.

15 Plaintiffs have filed a motion for summary judgment or, in the

16 alternative, summary adjudication, and defendants have filed a

17 motion for summary judgment.[1]

18 I.   Factual and Procedural Background

19       On April 8, 2003, pursuant to Tribal Resolution No. 03-

20 R-06, approved on March 31, 2003, the Karuk Tribe of California

21 submitted a fee-to-trust application to the regional director of

22 the BIA.  The tribe requested that the United States hold 0.90

23 acres of land ("the land") in the City of Yreka and County of

24

25

26

27       [1]    Defendant Michael Mallory is no longer a party to this
   action.  (See Docket No. 11 (stipulated consent decree and
28 order).)

2

1  Siskiyou[2] in trust for the tribe.  (See AR000001-AR000080.[3])  The

2  tribe's application stated that it had purchased the land in 1999

3  and had operated a health and dental clinic (commonly referred to

4  as "Yreka Clinic," "Yreka Medical Clinic," or "Foster/Yreka

5  Clinic") on the land for longer than a decade.  The tribe had

6  remodeled a building on the land in three phases, with the final

7  phase to be completed in June of 2003.  In its application, the

8  tribe indicated that it had originally intended to build a new

9  building on land already held in trust by the United States, but

10 had purchased additional land and remodeled rather than

11 constructed a new building because of a cease and desist order on

12 new construction in the City of Yreka due to the inadequacy of

13 the sanitary sewer system.[4]

14 _____

15        [2]    The regional director of the BIA described the land as
   follows:
16
17        Parcel 3-A-1, as shown on Boundary Line Adjustment &
          Parcel Map Survey Recorded July 14, 1979 in Book 7, Page
          3 of Parcel Map in the office of the County Recorder of
18        Siskiyou County.

19        Assessor's Parcel No.: 061-341-070, 0.90 acres[.]

20 (AR000183.)

21        [3]    Defendants lodged the administrative record.  (See
   Docket No. 13.)  Plaintiffs did not move to augment the
22 administrative record, as they were permitted to do so on or
   before January 10, 2011.  (See Status (Pretrial Scheduling) Order
23 at 2:23-24 (Docket No. 14).)  Defendants' version of the
   administrative record consists of documents Bates-numbered
24 AR000001-AR000257.

25        [4]    In opposition to defendants' motion, plaintiffs request
   that the court judicially notice Order No. R1-2003-0048 by the
26 California Regional Water Quality Control Board, North Coast
   Region.  (See Pls.' Req. for Judicial Notice Ex. A (Docket No.
27 20).)  That order, issued the month following the tribe's
   application, rescinded the cease and desist order, thus
28 permitting new construction.  Defendants have not objected to the

                                      3

The application first addressed the policy on land acquisition found at 25 C.F.R. § 151.3(a).  The application indicated that the land "is located approximately 1.4 miles from Tribal Trust land within the ancestral territory."  (AR000006; see also id. ("The [] clinic is the Yreka Clinic, which is located approximately 1.4 miles from the Tribal housing, within walking distance of Karuk trust land.").  The tribe requested trust status because "it is a goal of the Tribe, as a Self Governance Tribe, to operate all tribal programs and facilities on Tribal Land."  (Id.; see also AR000007 ("The Karuk Tribe is one of the largest California Self-Governance Tribes currently in negotiation compact agreements within the Departments of the Interior [sic].  Since 1996, our tribe has continued to assume sovereign jurisdiction of our ancestral territory and the Tribal and Federal trust responsibilities therin.").)

The tribe stated that its health program provides care to the majority of the "tribal and community members." (AR000006.)  At the time, the tribe had "three clinics in the aboriginal territory," with only one of them located on trust land.  (Id.)  The Yreka Clinic would be the second clinic located on trust land.

The application then addressed seven factors that the

request for judicial notice, but argue that the rescission order is not relevant.  (See Defs.' Reply at 4:6-5:28 (Docket No. 23).)
Notably, plaintiffs have not argued that the rescission order should have been part of the administrative record. Further, even if the court treated it as part of the administrative record, the court's analysis would not be affected because, as discussed later, the regional director implicitly considered and rejected the argument that a new clinic could be built on existing trust land.

4

Secretary is required to consider pursuant to 25 C.F.R. §§ 151.10
and 151.11 for off-reservation land acquisitions.  For example,
as to the tribe's need for the additional land, the tribe
reiterated that it "has continued to assume sovereign
jurisdiction of [its] ancestral territory and the Tribal and
Federal trust responsibilities therein." (AR000007.)  The tribe
explained that "[a]s the tribal capacity to protect and preserve
[its] cultural and tribal trust resources continues to grow, the
tribe has the trust responsibility to acquire culturally
significant sites to ensure culturally sensitive management of
these sites is upheld." (Id.)  The tribe also explained that
"[t]he clinic operates on minimal budget[,] therefore the
acquisition of this parcel is crucial for the Tribe to freely
exercise and preserve cultural management over quality health
care and self-determination." (Id.)

As to the proposed land use, the tribe stated that it
had operated a health and dental clinic on the land for longer
than a decade and that it was in the process of remodeling the
building, "which will enhance upon the tribes [sic] ability of
self sufficiency and provide quality medical, dental and
behavioral health services." (AR000008.)  Regarding the tax
impact of the acquisition on political subdivisions, the tribe
stated that it had paid $5,610.00 in property taxes the previous
year.  The tribe implied that any tax impact would be offset by a
reduction in reliance on County-sponsored welfare because the
Yreka Clinic provides medical and dental care not only to
members, but to non-members for a fee.  According to the tribe,
the Yreka Clinic is "one of the few Medi-cal excepting [sic]

1  clinics in Yreka." (AR000008.)

2          Pursuant to § 151.11(d), on June 18, 2004, the BIA

3  issued a "Notice of Off Reservation Land Acquisition Application

4  (Non-Gaming)." (See AR000090-AR000100.)  The City filed

5  comments, (see AR000110-AR000112), to which the tribe responded.

6  (See AR000137-AR000139.)  In its comments, the City claimed that

7  "very little benefit appears to flow to the KTOC in the transfer

8  of this property in fee ownership to trust ownership."

9  (AR000110.)  The City claimed that the land is approximately 100

10  miles from the tribe's "traditional tribal lands." (Id.)  While

11  the land is "approximately one mile to the Native American

12  Housing project," the land is located in "the heart of the City

13  of Yreka, and is surrounded by developments controlled by the

14  City of Yreka Zoning Ordinance, which properties will be directly

15  affected by the use of the subject parcel." (Id.)  The City

16  acknowledged that the current use is consistent with zoning, but

17  raised concerns that future uses would be inconsistent or that

18  encroachments on setback limitations would occur.

19          The City informed the regional director that it could

20  sustain the loss of tax revenue and still provide services such

21  as police, fire, and utilities, but the City argued that "this

22  situation would not be fair or appropriate on a different scale."

23  (AR000111.)  In concluding its comments, the City requested that

24  the Secretary impose two conditions to the approval of the

25  application: (1) an in-lieu yearly contribution equivalent to the

26  lost property tax revenue received for services provided and (2)

27  that the current use of the land remain unchanged.

28          On June 9, 2007, the BIA requested more information

6

from the tribe, including whether the proposed use was non-gaming, gaming, or gaming-related.  (See AR000155.)  The tribe responded with a new tribal resolution clarifying that the land be taken into trust for non-gaming purposes.  (See AR000158-AR000164.)

On May 14, 2008, the regional director issued the Notice of Decision ("NOD" or "decision"), in which he stated that it is the BIA's intention to accept the land into trust for the Karuk Tribe of California.  (See AR000183-AR000202.)  In the decision, the regional director addressed the land acquisition policy under § 151.3(a) and the factors the Secretary is required to consider under §§ 151.10 and 151.11 for off-reservation land acquisitions.  The regional director's decision addressed the City's concerns raised in its comments.

The City and City Council, plaintiffs in this action, filed an appeal of the regional director's decision to the Interior Board of Indian Appeals ("IBIA").  (AR000230-AR000231.) On appeal, they argued that (1) there is no statutory authority for the acquisition because the land is not within or adjacent to the exterior boundaries of the tribe's reservation or within a tribal consolidation area and the tribe does not have a sufficient interest in the land to support the acquisition, (2) the regional director's discussion of the proposed land use was based on erroneous facts, and (3) the land would possibly be put to uses that do not conform to the City's zoning and general plan, such as gaming uses, and would possibly increase conflicts between the tribe and City and City Council.  Plaintiffs requested that approval of the land acquisition be limited to

1  non-gaming uses.

2          On June 7, 2010, the IBIA issued its decision,

3  responding to plaintiffs' arguments and affirming the regional

4  director's decision.  See City of Yreka, Cal., & City Council of

5  the City of Yreka, Cal. v. Pac. Reg'l Dir., Bureau of Indian

6  Affairs, 51 IBIA 287 (2010).  In affirming the regional

7  director's decision, the IBIA concluded that "Appellants have not

8  shown that the Regional Director's Decision was erroneous, was

9  based on material factual inaccuracies, or reflected an improper

10  exercise of his discretion, and that the administrative record

11  demonstrates that he considered each of the criteria in 25 C.F.R.

12  §§ 151.10 and 151.11 and reasonably exercised his discretion."

13  Id. at 297.

14  II.  Discussion

15       A.   Summary Judgment Standard

16          Summary judgment is proper "if the movant shows that

17  there is no genuine dispute as to any material fact and the

18  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

19  P. 56(a).  A material fact is one that could affect the outcome

20  of the suit, and a genuine issue is one that could permit a

21  reasonable trier of fact to enter a verdict in the non-moving

22  party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

23  248 (1986).  The party moving for summary judgment bears the

24  initial burden of establishing the absence of a genuine issue of

25  material fact and can satisfy this burden by presenting evidence

26  that negates an essential element of the non-moving party's case.

27  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

28  Alternatively, the moving party can demonstrate that the

1  non-moving party cannot produce evidence to support an essential

2  element upon which it will bear the burden of proof at trial.

3  Id.

4         Once the moving party meets its initial burden, the

5  burden shifts to the non-moving party to "designate 'specific

6  facts showing that there is a genuine issue for trial.'"  Id. at

7  324 (quoting then-Fed. R. Civ. P. 56(e)).  In deciding a summary

8  judgment motion, the court must view the evidence in the light

9  most favorable to the non-moving party and draw all justifiable

10  inferences in its favor.  Anderson, 477 U.S. at 255.  When the

11  parties submit cross-motions for summary judgment, the court must

12  consider each motion separately to determine whether either party

13  has met its burden, "giving the nonmoving party in each instance

14  the benefit of all reasonable inferences."  ACLU of Nev. v. City

15  of Las Vegas, 333 F.3d 1092, 1097 (9th Cir. 2003).

16      B.   Exhaustion of Administrative Remedies

17         Plaintiffs bring suit pursuant to the APA.  See 5

18  U.S.C. § 702 (providing for right of judicial review); 25 C.F.R.

19  § 151.12(b) (allowing for thirty days to seek judicial review of

20  Secretary's decision to acquire land under IRA).

21         As a general rule, only final agency actions are

22  subject to judicial review and a plaintiff must exhaust his

23  administrative remedies.  5 U.S.C. § 704.[5]  Defendants represent

24

25         [5]    Section 704 provides in full:

26  Agency action made reviewable by statute and final agency
    action for which there is no other adequate remedy in a
27  court are subject to judicial review.  A preliminary,
    procedural, or intermediate agency action or ruling not
28  directly reviewable is subject to review on the review of

to the court, and plaintiffs do not dispute, that BIA's regional
directors have authority to review and decide applications for
discretionary off-reservation trust acquisitions for non-gaming
purposes pursuant to internal delegations and procedures.
(Defs.' Mot. at 5:24-27 (Docket No. 15-1).)   The Department of
the Interior's regulations provide that "[a]ny interested party
affected by a final administrative action or decision of an
official of the Bureau of Indian Affairs issued under regulations
in Title 25 of the Code of Federal Regulations may appeal to the
Board of Indian Appeals."[6]   43 C.F.R. § 4.331; see also 25 C.F.R.
§ 2.6(b) ("Decisions made by officials of the Bureau of Indian
Affairs shall be effective when the time for filing a notice of
appeal has expired and no notice of appeal has been filed.").
The IBIA "decides finally for the Department appeals . . .
[concerning] [a]dministrative actions of officials of the Bureau

the final agency action.   Except as otherwise expressly
required by statute, agency action otherwise final is
final for the purposes of this section whether or not
there has been presented or determined an application for
a declaratory order, for any form of reconsideration, or,
unless the agency otherwise requires by rule and provides
that the action meanwhile is inoperative, for an appeal
to superior agency authority.

5 U.S.C. § 704.

   [6]   "No decision of . . . [a] BIA official that at the time
of its rendition is subject to appeal to the Board, will be
considered final so as to constitute agency action subject to
judicial review under 5 U.S.C. [§] 704, unless it has been made
effective pending a decision on appeal by order of the Board."
43 C.F.R. § 4.314(a); see also 25 C.F.R. § 2.6(a) ("No decision,
which at the time of its rendition is subject to appeal to a
superior authority in the Department, shall be considered final
so as to constitute Departmental action subject to judicial
review under 5 U.S.C. [§] 704, unless when an appeal is filed,
the official to whom the appeal is made determines that public
safety, protection of trust resources, or other public exigency
requires that the decision be made effective immediately.").

10

1   of Indian Affairs."   43 C.F.R. § 4.1(b)(1)(i).

2        Here, plaintiffs appealed the regional director's

3   decision to the IBIA.   Applying a deferential standard of review,

4   the IBIA affirmed the regional director's decision.[7]

5   Accordingly, plaintiffs have exhausted their administrative

6   remedies.

7        C.   Merits

8        Under the APA, an agency's decision may be set aside by

9   a court only if it is "arbitrary, capricious, an abuse of

10  discretion, or otherwise not in accordance with law."   5 U.S.C. §

11  706(2)(A).   This standard of review is narrow, and the court may

12  not substitute its judgment for the judgment of the agency.

13  Earth Island Inst. v. Carlton, 626 F.3d 462, 468 (9th Cir. 2010).

14  An agency's decision may be reversed only "if the agency relied

15  on factors Congress did not intend it to consider, entirely

16  failed to consider an important aspect of the problem, or offered

17  an explanation that runs counter to the evidence before the

18  agency or is so implausible that it could not be ascribed to a

19  difference in view or the product of agency expertise."   Id. at

20  469 (quoting Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir.

21  2008) (en banc)) (internal quotation marks omitted).   An agency

22  action will not be reversed where the agency is able to

23  demonstrate a "rational connection between the facts found and

24  the conclusions made."   Native Ecosystems Council v. U.S. Forest

25  Serv., 418 F.3d 953, 960 (9th Cir. 2005) (quoting Nat'l Wildlife

26  Fed'n v. U.S. Army Corps of Eng'rs, 384 F.3d 1163, 1170 (9th Cir.

27  ─────────────

28      [7]   Plaintiffs have only challenged the regional director's
    decision, not the IBIA's decision.

1   2004)) (internal quotation marks omitted).

2        The IRA authorizes the Secretary of the Interior, "in
3   his discretion," to acquire land and hold it in trust "for the
4   purpose of providing land for Indians."   25 U.S.C. § 465.
5   Congress's purpose in enacting the IRA was "to rehabilitate the
6   Indian's economic life and to give him a chance to develop the
7   initiative destroyed by a century of oppression and paternalism."
8   South Dakota v. U.S. Dep't of Interior, 487 F.3d 548, 552 (8th
9   Cir. 2007) ["South Dakota II"] (quoting South Dakota v. U.S.
10  Dep't of Interior, 423 F.3d 790, 798 (8th Cir. 2005) ["South
11  Dakota I"]) (internal quotation marks omitted).

12       The broad goal was "to conserve and develop Indian
13  lands and resources," and "Congress believed that additional land
14  was essential for the economic advancement and self-support of
15  the Indian communities."   South Dakota II, 487 F.3d at 552
16  (quoting South Dakota I, 423 F.3d at 798) (internal quotation
17  marks omitted).   The Secretary may acquire land already owned by
18  a tribe.   See Chase v. McMasters, 573 F.2d 1011, 1016 (8th Cir.
19  1978) ("The Secretary may purchase land for an individual Indian
20  and hold title to it in trust for him.   There is no prohibition
21  against accomplishing the same result indirectly by conveyance of
22  land already owned by an Indian to the United States in trust.").

23        "When the Secretary takes land into trust on behalf of
24  a tribe pursuant to the IRA, several important consequences
25  follow."   Conn. ex rel. Blumenthal v. U.S. Dep't of Interior, 228
26  F.3d 82, 85 (2d Cir. 2000).   "Land held in trust is generally not
27  subject to (1) state or local taxation; (2) local zoning and
28  regulatory requirements; or, (3) state criminal and civil

jurisdiction, unless the tribe consents to such jurisdiction."
Id. at 85-86 (citing 25 U.S.C. § 465; 25 C.F.R. § 1.4(a); 25
U.S.C. §§ 1321(a), 1322(a)) (citations omitted).

Here, plaintiffs claim that the regional director
misapplied the land acquisition policy set forth at § 151.3(a)
and failed to sufficiently consider the factors listed in §§
151.10 and 151.11 for off-reservation land acquisitions.

1.   Section 151.3(a)

The land acquisition policy provides that land may be
acquired for a tribe in trust status when any of the following
conditions exist: (1) "the property is located within the
exterior boundaries of the tribe's reservation or adjacent
thereto, or within a tribal consolidation area"; (2) "the tribe
already owns an interest in the land"; or (3) "the Secretary
determines that the acquisition of the land is necessary to
facilitate tribal self-determination, economic development, or
Indian housing."   25 C.F.R. § 151.3(a)(1)-(3).

Here, the regional director explained that the
"acquisition falls within the land acquisition policy as set
forth by the Secretary of the Interior." (AR000184.)   Plaintiffs
argue that the regional director acted arbitrarily or
capriciously because he did not expressly specify the subsection
of § 151.3(a) on which he relied.   (Pls.' Mot. at 5:9-22 (Docket
No. 16-1).)   However, it is clear from the decision that he
relied on the tribe already owning an interest in the land under
§ 151.3(a)(2) and his determination that acquisition of the land
is necessary to facilitate tribal self-determination and economic
development under § 151.3(a)(3).

a.   <u>Tribal ownership of an interest in the land</u>

Plaintiffs correctly point out that the mere fact that a tribe owns an interest in the land is insufficient to support a land acquisition under § 151.3(a)(2).  Even if a tribe owns the land, a plaintiff can still challenge a proposed acquisition as inconsistent with 25 U.S.C. § 465, which authorizes discretionary acquisitions "for the purpose of providing land for Indians."  The courts have interpreted § 465 as being limited by the requirement that the acquisition fosters self-support and ameliorates prior allotment policies.  <u>See, e.g.</u>, <u>South Dakota II</u>, 487 F.3d at 552 ("The State and the County argue that the Secretary lacked statutory authority to acquire the land at issue.  Relying on our holding in <u>South Dakota</u>, they note that the Secretary's discretion to acquire trust land 'for the purpose of providing land for Indians' is limited by the requirement that the land be acquired for self-support and to ameliorate the damage of prior allotment policies."); <u>South Dakota v. U.S. Dep't of Interior</u>, --- F. Supp. 2d ----, ----, 2011 WL 382744, at *13 (D.S.D. Feb. 3, 2011) (plaintiff challenged the proposed acquisition as inconsistent with the statutory aims of 25 U.S.C. § 465).

To the extent plaintiffs argue that the proposed acquisition is inconsistent with § 465, this argument fails because, as discussed in more detail below, the regional director expressly found that the acquisition will foster self-determination.

///

///

b.   <u>Necessary to facilitate tribal</u>

<u>self-determination, economic development, or</u>

<u>Indian housing</u>

Regardless of whether the requirements of § 151.3(a)(2) were satisfied, the acquisition was supported under § 151.3(a)(3) by the regional director's finding that it was necessary to facilitate tribal self-determination and economic development. The term "necessary," within the meaning of § 151.3(a)(3), is not defined by the regulations, as in the context of other regulations. <u>See, e.g.</u>, 42 C.F.R. § 413.9(b)(2) (Medicare regulations defining "Necessary and proper costs" as "costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities").

At one extreme, a necessary condition can mean an essential condition or a sine qua non. <u>See, e.g.</u>, <u>In re</u> <u>Microsoft Corp. Antitrust Litig.</u>, 355 F.3d 322, 325 (4th Cir. 2004) (in offensive collateral estoppel context, defining necessary as critical or essential, as opposed to "supportive of"); Dictionary.com, http://dictionary.reference.com/browse/necessary (last visited May 24, 2011) (defining necessary as essential, indispensable, or requisite). At the other extreme, a necessary condition can mean a helpful or appropriate condition. <u>See, e.g.</u>, <u>M'Culloch v.</u> <u>Maryland</u>, 17 U.S. 316, 421 (1819) (interpreting Necessary and Proper Clause of the Constitution and holding, "[l]et the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter

15

1  and spirit of the constitution, are constitutional"); 42 C.F.R. §

2  413.9(b)(2).

3      This court has found only one case that has addressed

4  the definition of "necessary" in § 151.3(a)(3).  In <u>City of</u>

5  <u>Lincoln City v. U.S. Department of Interior</u>, 229 F. Supp. 2d

6  1109, 1124 (D. Or. 2002), the court assumed, <u>arguendo</u>, that

7  necessary requires less than essential, but held that the

8  difference is not significant under an arbitrary or capricious

9  standard of review.  <u>Id.</u>  Thus, the Secretary's finding that the

10  acquisition was necessary was sufficient even if the Secretary

11  was required to find that the acquisition was essential.  <u>Id.</u>

12      Considering that the broad goal behind the IRA was "to

13  conserve and develop Indian lands and resources," and "Congress

14  believed that additional land was essential for the economic

15  advancement and self-support of the Indian communities," <u>South</u>

16  <u>Dakota II</u>, 487 F.3d at 552 (quoting <u>South Dakota I</u>, 423 F.3d at

17  798) (internal quotation marks omitted), this court is persuaded

18  that the acquisition need not be essential or a sine qua non to

19  self-determination or economic advancement, but the Secretary

20  must conclude that the acquisition is more than merely helpful or

21  appropriate.

22      Here, in analyzing the tribe's need for the additional

23  land, which the Secretary must consider pursuant to § 151.10(b),

24  the regional director explained that, while the tribe once had

25  over one million acres of aboriginal homeland along the Klamath

26  River, the tribe has been able to acquire only 620 acres, which

27  are "scattered" throughout Orleans in Humboldt County and Yreka

28  in Siskiyou County, and has put them in trust status.

16

(AR000185.)  The regional director further explained:

> The Karuk Tribe has a large membership in and around the Yreka area.  They currently run the clinic on the subject parcel in order to provide health and dental services for members and non-members alike.  Of the current trust parcels, none achieve the same objective.  The tribe has indicated that the clinic operates on a limited budget, and acceptance of the land into trust is <u>critical</u> to the tribe's continued operation of the clinic for residents of the Yreka area.

(<u>Id.</u> (emphasis added).)

The regional director recognized that the tribe's goal is to have a sufficient land base in order to meet their goals of "cultural and social preservation, self determination, self-sufficiency and economic growth." (<u>Id.</u>)  According to the regional director, the "proposed acquisition will allow the Tribe to consolidate its land holdings and exercise tribal sovereign powers over the subject property." (<u>Id.</u>)

In finding that the acquisition is "critical" to the continued operation of the Yreka Clinic, the regional director applied a definition of necessary that is actually closer to essential than appropriate or helpful.  Under an arbitrary or capricious standard of review, which requires deferring to an agency's reasonable interpretation of its own regulations, <u>Simpson v. Hegstrom</u>, 873 F.2d 1294, 1297 (9th Cir. 1989), the court cannot find that the regional director unreasonably interpreted the term "necessary."

Plaintiffs first argue that the regional director's decision "fails to articulate the factual and legal basis" on which he found that the land is "critical" to the tribe's continued operation of the Yreka Clinic. (Pls.' Mot. at 6:8-10 (internal quotation marks omitted in second quotation).)

17

Plaintiffs argue that "the Tribe's operating costs would be higher if the medical clinic were operated on the Property instead of on existing trust lands because the existing trust lands are closer to tribal housing." (Id. at 6:10-12.)

The regional director did not expressly address the argument that a new clinic could be built on existing trust land, despite the tribe having purchased the land to be acquired in 1999, operated a clinic on the land for longer than a decade, and remodeled the building.[8]  However, the regional director implicitly considered and rejected the argument for building a new clinic on existing trust land in addressing the tribe's need for the land: "They currently run the clinic on the subject parcel in order to provide health care and dental services for members and non-members alike.  Of the current trust parcels, none achieve the same objective.  The tribe has indicated that the clinic operates on a limited budget . . . ."  (AR000185.)

Second, plaintiffs argue that the regional director's decision does not "explain why, or even how, the act of taking 0.9 acres into trust--for use by Tribal and non-Tribal members--will assist the Karuk Tribe in cultural and social preservation or self-determination/self-sufficiency." (Pls.' Mot. at 6:17-

---

[8]     Plaintiffs did not raise this argument until they appealed the regional director's decision.  The IBIA persuasively responded: "[T]he record establishes that the Tribe originally intended to build a new clinic on its existing tribal trust land and decided to buy the Yreka Clinic only after its original plan was thwarted by the 1998 cease and desist order prohibiting any new construction in the City.  Given the extensive renovations to the clinic costing over $1.2 million, relocating the clinic to existing trust land at this point would be neither economical nor practical."  City of Yreka, Cal., & City Council of the City of Yreka, Cal. v. Pac. Reg'l Dir., Bureau of Indian Affairs, 51 IBIA 287, 296 (2010).

19.)  The court is satisfied that the regional director did not act arbitrarily or capriciously when he accepted the tribe's representation that the land, on which the tribe intends to continue to operate a health and dental clinic, will assist the tribe in meeting its goal of "cultural and social preservation, self determination, self-sufficiency and economic growth." (AR000185.)

Third, plaintiffs argue that § 151.3(a)(3) is not met because the "NOD contains factually incorrect information while other relevant information was disregarded.  The clinic presently operated by the Tribe is just one of many service providers in the City accepting Medicare and MediCal patients." (Pls.' Mot. at 6:20-22.)  Plaintiffs raised this same argument in appealing the regional director's decision to the IBIA, at which point the tribe acknowledged that following the regional director's decision another clinic, not operated by the tribe, began accepting new Medicare and MediCal patients.  City of Yreka, 51 IBIA at 296.  However, even if a fact that did not exist when the regional director made his decision were relevant, plaintiffs have not demonstrated to this court that another clinic accepting new patients, not operated by the tribe, undermines the regional director's decision.

Fourth, plaintiffs argue that, because the tribe already owns the land in fee, the tribe does not need the land to be taken into trust to continue to deliver culturally appropriate medical services to tribal members.  (See Pls.' Opp'n at 4:8-17.) The Eighth Circuit rejected this same argument in the context of § 151.10(b).  The Eighth Circuit explained that "most of the land

currently taken into trust has been previously purchased by a tribe" and concluded that "it would be an unreasonable interpretation of 25 C.F.R. § 151.10(b) to require the Secretary to detail specifically why trust status is more beneficial than fee status in the particular circumstance." South Dakota I, 423 F.3d at 798, 801; see id. at 801 ("It was sufficient for the Department's analysis to express the Tribe's needs and conclude generally that IRA purposes were served.  Its conclusion that the Tribe needed the land to be taken into trust was therefore reasonable.").

           2.   Section 151.10(c)

           The purpose for which the land will be used must be considered by the Secretary.  25 C.F.R. § 151.10(c); South Dakota I, 423 F.3d at 801 ("It was reasonable for the Secretary to accept the Tribe's representations in his analysis of 25 C.F.R. § 151.10(c).").

           Here, the regional director explained the tribe's purpose as follows:

> Since acquiring the property in 1997, the Karuk Tribe has completely remodeled the Health/Dental clinic.  The tribe plans to continue using the property for purposes of a Health/Dental clinic, which it has already been doing for the past nine years.  The tribe's sizable member population in that area, approximately 350 members, uses the clinic regularly.  Additionally, the tribe accepts non-member patients, and is the only clinic within a 100 mile radius accepting new Medicare and MediCal patients.

(AR000185.)

           Plaintiffs argue that the regional director failed to consider the impact of gaming uses.  (Pls.' Mot. at 6:26-7:28; Pls.' Opp'n at 4:22-28.)  However, the Secretary need not consider "speculati[ve]" future uses of the land.  See City of

1  <u>Lincoln City</u>, 229 F. Supp. 2d at 1124; <u>see e.g.</u>, <u>South Dakota I</u>,

2  423 F.3d at 801, 801 n.9 (holding that "the Secretary was not

3  required to seek out further evidence of possible gaming purposes

4  in light of the Tribe's repeated assurances that it did not

5  intend to use the land for gaming," a letter from the then-state

6  governor stating that he had been assured that the tribe would

7  not conduct gaming on the land, and the tribe's acknowledgment

8  that "if it were later to seek to allow gaming on the land, it

9  would fully comply with the additional application and approval

10  requirements in the Indian Gaming Regulatory Act (IGRA), 25

11  U.S.C. §§ 2701-2721").  As the IBIA's decision explained the

12  issue:

> This fear . . . is entirely speculative.  Nothing in the
> record suggests that the Tribe contemplates the use of
> the parcel for gaming.  To the contrary, not only does
> the Tribe admit that the land does not qualify for gaming
> use under the Indian Gaming Regulatory Act, 25 U.S.C. §
> 2719(a), but the Tribe contends that the renovated site
> is completely developed and could not feasibly or
> fiscally-responsibly be used for gaming even if the Tribe
> wanted it to be so used.  Additionally Tribal Resolution
> No. 07-R-160, approved on December 19, 2007, explicitly
> eschewed the use of the parcel for gaming.

19  <u>City of Yreka</u>, 51 IBIA at 296-97.  Accordingly, the regional

20  director adequately considered the tribe's purpose for the land.[9]

---

22  [9]   With respect to the other factors that the Secretary is
23  required to consider pursuant to 25 C.F.R. §§ 151.10 and 151.10,
    plaintiffs only make passing arguments that the Secretary did not
24  reasonably consider them.  The administrative record reveals that
    the regional director reasonably considered the other factors.
25  (<u>See</u> AR000184-AR000187 (considering existence of statutory
    authority for the acquisition, tax impacts, jurisdictional
26  problems and potential conflicts, ability of BIA to handle
    additional trust responsibilities, compliance with environmental
27  regulations, anticipated economic benefits, and distance between
    land to be acquired and tribe's reservation in light of the
28  City's comments about economic benefits to tribe, zoning
    ordinances, and lost tax revenue).)

1     In sum, the administrative record reveals that the

2 regional director reasonably applied the policy on land

3 acquisition and considered the relevant factors for off-

4 reservation land acquisitions.  The regional director's decision

5 also responded to each of the City's concerns raised in its

6 comments.  The Secretary's decision was not arbitrary,

7 capricious, an abuse of discretion, or otherwise not in

8 accordance with law.

9     IT IS THEREFORE ORDERED that defendants' motion for

10 summary judgment be, and the same hereby is, GRANTED.

11     IT IS FURTHER ORDERED that plaintiffs' motion for

12 summary judgment or, in the alternative, summary adjudication be,

13 and the same hereby is, DENIED.

14 DATED:  June 13, 2011

15

16 _____

17 WILLIAM B. SHUBB
   UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

27

28